UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

Michael S. Kimm, Esq. (MK4476)
Jonathan Lugo, Esq.
KIMM LAW FIRM
333 Sylvan Avenue, Suite 106
Tel: 917-477-8500
*Attorney for Plaintiffs*

| | |
|---|---|
| BRANDON PARK,<br><br>Plaintiff,<br>vs.<br><br>FAIR COLLECTIONS & OUTSOURCING, INC., dba FCO, TDC FORT LEE, LLC, and LINCOLN PROPERTIES aka HUDSON LIGHTS,<br><br>Defendants. | 20-cv-<br><br>Civil Action<br><br>**Complaint with Jury Demand** |

Plaintiff brings this action against the defendants under the Fair Debt Collection Practices Act and under state law, as stated below.

**<u>JURISDICTION AND VENUE</u>**

1. This court has jurisdiction over this action under 28 U.S.C. 1331 as it involves claims under the Fair Debt Collection Practices Act, 15 U.S.C.§§ 1692 and particularly sub-parts d, e and f. The court has supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367, as they arise from a common nucleus of operative facts.

2. Venue is proper under 28 U.S.C. 1391(a)(2) because significant events occurred in this district.

## PARTIES

3. Plaintiff and his wife are individuals residing in Bergen County, New Jersey. Plaintiff is an alleged "debtor" according to the defendants.

4. Defendant Lincoln Properties is a property management company that is believed to own, operate or manage a residential apartment building known as "Hudson Lights" in Fort Lee, New Jersey. Defendant Lincoln Properties is believed to be a successor-in-interest of the original managing entity, TDC Fort Lee, LLC, a managing or owner entity for Hudson Lights with an address at "2030 Hudson Street, Fort Lee, New Jersey 07024," with whom plaintiff's residential lease had been entered into in April 2018.

5. Defendant TDC Fort Lee, LLC, is believed to be the property owner or agent who committed some of the acts relevant to this action, and maintains an address at 2030 Hudson Street, Fort Lee, NJ.

6. Defendant Fair Collections & Outsourcing, Inc., also known as FCO, holds itself out as "collection agency" authorized to do business in the State of New Jersey, and lists its address at 12304 Baltimore Avenue, Suite E, Beltsville, MD 20705. This defendant has been holding itself out as a collection agent for Lincoln Properties as its disclosed principal in its collection efforts against plaintiff.

7. The relationship between Lincoln Properties and FCO are disclosed principal for a disclosed agent, in connection with the attempt to collect an alleged non-liquidated phantom "debt" that never existed in the first place. Despite plaintiff's numerous attempts to inform the agent that the principal did not have any claim of "debt" against plaintiff, the

collection agent insisted upon collecting the alleged, phantom "debt" thus necessitating this action for defendants' bad faith "debt" referral and collection practices, between principal and agent.

## COMMON ALLEGATIONS

### A. Plaintiff's Lease Dated April 2018

8. Between approximately April 1, 2018 and January 15, 2019, plaintiff and his wife were tenants in a two-bedroom residential apartment, Unit 1025, in the building generally known as Hudson Lights, then owned or managed by TDC Fort Lee, LLC, under a written lease dated April 12, 2018.

9. Throughout the next several months that plaintiff remained in the building, the building suffered from recurrent problems in two areas:

A. While the Rules and Regulations stating that the building was "smoke-free," tenants engaged in extensive smoking of tobacco and cannabis products in various parts of the building including on the tenth floor, which was repeatedly reported to the management, known by management, with no enforcement. Such smoke found its way through the hallways and even inside residential units.

B. While the building was advertised and rented as "state of the art, and modern," there were only two elevators servicing the high rise with extensive roster of residents; and one or both of the elevators were routinely "broke," "disabled," or "not working" for days at a time, such that, with the single elevator unable to service the vast number of residents in the building, residents were routinely required to walk up and down

the stairs or wait prolonged periods to board a crammed ride.

10. Plaintiff relocated into the Hudson Lights based upon the property owner and/or manager's extensive marketing campaign that highlighted these attributes, even when plaintiff was viewing Unit 1025 before signing the lease.

11. Plaintiff relocated in April 2018 and resided in Hudson Lights for several months before concluding that the building was constructed of substandard materials and/or workmanship as services such as elevators routinely broke down.

**B. Plaintiff's Notice to Quit Tenancy Dated December 2018**

12. Having emphasized that the "entire building is completely smoke free," defendants knew that various tenants and/or their guests were actually smoking inside their apartment units, often marijuana, which was still largely illegal at the relevant times, and failed to enforce the rules such that the non-smoking tenants were routinely caused to experience the gross, unpleasant effects of smoke filled hallways, and the odor of smoke in their air circulation/conditioning system, that often could be smelled in the tenth floor hallways as in other areas of the building.

13. On or about December 27, 2018, after recurrence of those issues, plaintiff decided that he and his wife could no longer continue to reside in the building. Plaintiff retained Michael Kimm, Esq., and served the then property management company with a letter/notice of intention to quit tenancy.

14. Plaintiff's letter dated December 27, 2018, sent by plaintiff's counsel Michael Kimm stated:

We are counsel to Mr. Brandon Park and his wife Mrs. Jin Lee of Apartment 1025 and we write to advise that they will be vacating the unit as of January 15, 2019.

The reasons for their decision to vacate are mainly due to (1) the chronic disability of the elevators and (2) management's failure to enforce the anti-smoking rules.

We were initially consulted several months ago about these matters and our clients tried to wait out the initial term of the lease but these matters have become so frequent and recurrent as to have become routine now. Both our clients are non-smokers who are allergic to secondary smoke. Curiously, even management knows full well that numerous tenants are smoking tobacco products.

Our clients have routinely smelled the odor of cannabis apparently emanating from the ninth or lower floors along with tobacco odors, but a review of the Rules & Regulations reveals that management has no real means of enforcing the anti-smoking ban. If an anti-smoking ban exists, how are apartments checked for proof of smoking or not? All that can happen is for tenants to raise the issue with no resolution, and all that management can do, as it appears to be current case, is to send threat notice after threat notice to tenants with no means of real enforcement.

Similarly, the elevators appear to have been problematic since the building opened and certainly since our clients moved into the building. The elevator breakdowns have become so frequent as to be routine. This is hardly a hallmark of a luxury building.

We request your confirmation that the apartment has been listed for immediate tenancy. While we would gladly have arranged for to list the apartment through a local broker, the lease doe not appear to contain a "sublease" covenant and thus the lease is partly defective as it prevents a tenant's potential sublease as reasonable mitigation efforts.

We are sending this communication by email because the

lease does not specify the manner of notices and addresses to be used.

Thank you for your prompt attention to this matter.

15. Plaintiff had resided in Unit 1025 for barely 6 months and used it spotlessly. In advance of the date of departure, plaintiff pre-notified the building management so as to enable anyone to do a joint visual inspection of the property to see that Unit 1025 was being surrendered in clean, satisfactory condition. Plaintiff was available for such a walk-through but no one from management appeared but plaintiff later telephoned management and confirmed that they had entered Unit 1025 and had presumably observed it had been returned clean and without damage.

**C. Defendant Property Mgmt Company's Failure to Re-List Unit 1025**

16. Under New Jersey law governing lease agreements, commercial and residential, landlords are required to mitigate damages in case of any alleged breach of lease.

17. In every case where a tenant has allegedly quit tenancy or "defaulted" sooner than the actual date of termination of the lease, landlords are required by law to immediately re-list the property for rent and mitigate the damages they might seek from the former tenant in any breach-of-contract action.

18. Stated differently, property owners have a duty to mitigate damages caused by tenants that allegedly "breached" either residential and commercial leases. See Sommer v. Kridel, 74 N.J. 446, 458 (1977); McGuire v. City of Jersey City, 125 N.J. 310, 320 (1991); Fanarjian v. Moskowitz, 237 N.J. Super. 395, 406 (App. Div. 1989). The landlord has the

burden of proving the reasonableness of his or her mitigation efforts. Sommer, supra, 74 N.J. at 458-59.

19. From time to time, the apartments at Hudson Lights are believed to be listed under the New Jersey Multiple Listing Service, or third-party brokers' listings, but also on Hudson Lights' own "Apartments Available" website portal for any prospective tenant to "search and find" an apartment directly, and thereby bypass brokers. After plaintiff relocated on January 15, 2019, plaintiff expected that Unit 1025 would be listed as "AVAILABLE" within days, so that defendant Lincoln Properties would be in compliance its legal duty to mitigate of damages.

20. After his lawyer's written notice to quit tenancy dated December 27, 2018, was hand delivered to management, plaintiff vacated Unit 1025 on January 15, 2019, as stated in the notice to quit.

21. Because defendant's duty to mitigate damages is an important requirement, plaintiff checked the NJMLS, local real estate listings, and most importantly checked the Hudson Lights "Apartments Available" portal twice a week between January 22, 2019, and April 2, 2019, to see whether defendant was complying with the mitigation requirement. Plaintiff took and retained screen shots of the Hudson Lights portal listings starting with January 22, 2019:




22. January 24, 2019:




23. January 26, 2019:




24. January 28, 2019:

25. January 29, 2019:



26. Similarly, plaintiff examined whether defendants had listed Unit 1025 on February1, 4, 9, 12; March 1, 5, 9, 14, 19, 25; and April 1 and 2, 2019. On April 2, plaintiff made a surprising discovery, preserved in this photograph:




27. In the photo, among the three corner apartments with incandescent lights, the third from the top, being Unit 1025, apparently had been occupied. Thus Hudson Lights had apparently rented Unit 1025 without listing the apartment for rent, after plaintiff vacated on

January 15, 2020. The rental date has never been disclosed to plaintiff.

**D. Defendants' Bad Faith Dunning/Collection Campaign**

28. As it has been settled for over a century, New Jersey law renders "penalties" unenforceable in contracts because they are not designed to make an injured party whole but, rather, are designed to punish a party who allegedly breached. In Westmount Country Club v. Kameny, 82 N.J. Super. 200, 206-07, 197 A.2d 379 (App. Div. 1964), the Appellate Division discussed why New Jersey renders penalty clauses void and unenforceable:

> Liquidated damages is the sum a party to a contract agrees to pay if he breaks some promise, and which, having been arrived at by a good faith effort to estimate in advance the actual damage that will probably ensue from the breach, is legally recoverable as agreed damages if the breach occurs. A penalty is the sum a party agrees to pay in the event of a breach, but which is fixed, not as a pre-estimate of probable actual damages, but as a punishment, the threat of which is designed to prevent the breach. McCormick, Damages, § 146, pp. 599-600.
>
> Parties to a contract may not fix a penalty for its breach. The settled rule in this State is that such a contract is unlawful. Suburban Gas Co. v. Mollica, 131 N.J.L. 61, 62 (Sup. Ct. 1943).
>
> In the determination of whether a clause in a contract is one for liquidated damages or a penalty, our courts have set up certain criteria as guides. The construction to be placed upon the clause in dispute is to be decided by considering not only the particular words in the contract, but the whole scope of the bargain, including the subject to which it relates. Monmouth Park Asso. v. Wallis Iron Works, 55 N.J.L. 132, 140 (E. & A. 1892).
>
> An agreement made in advance of breach, fixing the damages therefor, is not enforceable as a contract and does not affect the damages recoverable for the breach, unless (a) the amount so fixed is a reasonable forecast of just compensation for the harm that is caused by the breach, and (b) the harm that is caused by the breach is one that is incapable or very difficult of accurate estimate. 1 Restatement, Contracts, § 339, p. 552 (1932). And see Suburban

Gas Co. v. Mollica, supra; 218-220 Market St. Corp. v. Krich-Radisco, Inc., 124 N.J.L. 302, 305 (E. & A. 1939). However, if it appears that the parties have provided for an excessive sum in a case where the real damages are certain or readily reducible to certainty by proof, then the sum fixed is deemed a penalty and is not enforceable. Borden Co., Pioneer Ice Cream Division v. Manley, 127 N.J.L. 461, 463 (Sup. Ct. 1942).

Upon a consideration of the whole agreement, if it is doubtful whether the provision for payment is intended as a penalty or liquidated damages, it will be construed as a penalty, because the law favors mere indemnity. Monmouth Park Asso., supra, 55 N.J.L., at page 141.

In the present case, doubt does exist whether the paragraphs of the agreement in question call for liquidated damages. As noted, this term is not found in the contract. There is no statement that the damages arising from the breach of the agreement would be difficult of determination and therefore the full contract price is agreed upon as liquidated damages. Cf. Suburban Gas Co. v. Mollica, supra, 131 N.J.L., at page 62. Nor is there a statement that the unpaid balance now claimed by plaintiff is to compensate for plaintiff's expenses or loss of anticipated profits.

The law's sole purpose in departing from its usual rule of enforcing agreements, when it declines to enforce agreements for penalties, is to avoid extortion and injustice which a free power to stipulate damages would invite, and the proper test of whether a particular stipulation is a penalty and thus unenforceable is whether, viewed as of the time of its making, it is reasonably proportioned to the probable loss which will ensue from a breach. A provision in a contract to furnish facilities which provides that the full contract price is recoverable in the event of a breach -- absent evidence that the parties fixed the amount as a reasonable forecast of just compensation for the harm caused by a breach and that such harm is incapable or very difficult of accurate estimation -- bears no reasonable relation to actual damages and cannot be considered as liquidated damages. See 1 Restatement, Contracts, § 339, p. 552 (1932); Suburban Gas Co. v. Mollica, supra, p. 62; Summit v. Morris County Traction Co., 85 N.J.L. 193, 195 (E. & A. 1913); McCormick, Damages, § 149, p. 606.

29. Although defendant never disputed, and indeed could not dispute, their legal duty to mitigate damages, defendants purported to dispute plaintiff’s notice to quit and quitting

of tenancy with threats of unlawful "penalty" after "penalty" in bad faith.

30. On January 10, 2019, Hudson Lights' first bad faith action was sent by email to Kimm Law Firm through a law firm named "De Marco and De Marco Firm" who claimed to represent TDC Fort Lee, LLC, and engaged in threats to coerce plaintiff's payment of a phantom "penalty." The De Marco Law Firm wrote in relevant part:

> Assuming arguendo that your clients did in fact complain, which they did not, our client must be afforded a reasonable opportunity to address any and all issues of habitability. Clearly, that did not happen in the case of your clients. Rather, through your office, your clients provided less than thirty (30) day notice of their intent to vacate. Your clients' actions in this regard are not acceptable. As your clients are well aware, your clients' lease terminates in June 2019. As such, in addition to all other penalties for early termination, your clients are also responsible for an administrative fee equal to one (1) month's rent, namely, $4,500.00. [Emphasis added.]

31. In a second letter dated January 30, 2019, the De Marco Law Firm threatened to exact "penalties" against plaintiff unless plaintiff paid voluntarily:

> . . . Paragraph 25 states in relevant part:
>
> > [I]f Tenant vacates the Apartment before the expiration date of the Lease, notwithstanding the fact that the Landlord either accepts or re-Rents the Apartment, Tenant will be charged an Administrative fee equal to one month's Rent. ·
>
> Additionally, the Concession Addendum also states in relevant part:
>
> > If Tenant vacates the apartment before the end of the lease term, Tenant is responsible to pay the full rental value without any Concession.
>
> Naturally, the foregoing penalties are in addition to all other remedies to which the Landlord is entitled as a result of your clients' breach.

32. In a third letter dated December 26, 2019, from the De Marco Law Firm,

defendant TDC Fort Lee, LLC, threatened to exact penalties yet again, by "attaching and incorporating by reference" De Marco's two prior letters, dated January 10, 2019, and January 30, 2019, and demanding a response to defendants' demand for penalties.

33. All three letters were clear and unambiguous attempts to exact penalties in violation of the well settled law of New Jersey, and thus they did not constitute, separately or cumulatively, a valid basis for any "debt collection" but rather constituted unlawful harassment through extortionate demands for "penalties."

34. While the De Marco Law Firm acted as a debt-collection agency, it failed to post on an of its dunning letters any notice to alleged-debtor that "any information obtained from" any response "will be used for such purpose." By failing to post such a notice, required by the Fair Debt Collection Practices Act, the De Marco Law Firm is believed to have violated the Fair Debt Collection Practices Act on each of the three dates stated above.

35. From approximately October 2019 and continuing through at least February 2020, the threats from the De Marco Law Firm were fortified by defendant Fair Collections & Outsourcing, Inc. (FCOI), as FCOI made unwanted telephone calls and sent baseless demand dunning notices plaintiff and plaintiff's wife and attempted to collect upon the unlawful "penalties" that had been asserted by the defendants through the De Marco Law Firm.

36. Defendant FCOI telephoned plaintiff on multiple occasions and threatened adverse action unless plaintiff paid the "debt," referring to the unlawful and baseless "penalties."

37. Plaintiff instructed defendant FCOI to communicate only by writing, to not use the telephone, but defendant FCOI persisted.

38. On or about February 13, 2020, defendant FCOI sent to plaintiff's counsel's office email address an unsolicited, unauthorized email which stated in its entirety:

> Hello, this is an important message for MICHAEL S. KIMM, ESQ..
>
> This is not a sales related message.
>
> If you believe you have received this communication in error, please call us back at 877-324-7959 and reference number 4355329. Please mention that you have received this communication in error and permanently delete this communication, we thank you for your time.
> OR
> If you are not MICHAEL S. KIMM, ESQ., please call us back at 877-324-7959 and reference number 4355329. Please mention that you have received this communication in error and permanently delete this communication, we thank you for your time.
>
> If you are MICHAEL S. KIMM, ESQ., please continue to read this message.
>
> This communication may contain personal and private information, by continuing to read and / or perform any action with this message with or without the attachment, you acknowledge you are MICHAEL S. KIMM, ESQ.. If so, please scroll down

39. Defendant FCOI's email failed to contain any warnings as to its "debt collection" activity as required by the Fair Debt Collection Practices Act.

40. Instead, even as the email intentionally and deceptively stated that there was an "important message for Michael S. Kimm, Esq.," the only way to perceive the "important message" was to open the attachment, which could well have been a virus laden phishing device sent by an unknown sender with no prior authorization to communicate by email with

Kimm Law Firm.

41. On or about February 20, 2020, defendant FCOI telephoned Kimm Law Firm and spoke with Michael Kimm and asserted for the first time that it had sent a letter on February 13, 2020, by email. Upon opening the attachment that had been in this defendant's February 13, 2020, email, plaintiff came to learn that the attachment consisted of an alleged "verification of debt" purporting to state, as a matter of fact, that plaintiff "owed" the exact sum of $8,745.00 as a result of various unknown charges, unlawful penalties, and improper legal fees shown in a table concocted by defendants:

| Date | Description | Charge | Payment | Balance | Chg/Rec |
|---|---|---|---|---|---|
| | Balance as of 01/01/2019 | | | 0.00 | |
| 01/01/2019 | Actual Lease Rent (01/2019) | 4,500.00 | | 4,500.00 | 67312049 |
| 01/02/2019 | chk# PSID160852485-177 Terminal PSID 160852485 - CHECK21 | | 4,500.00 | 0.00 | 44756975 |
| 02/25/2019 | Rent cahrge till end of month, resdient broke lease. | 2,322.58 | | 2,322.58 | 68015355 |
| 02/25/2019 | Concession Payback given in June and July 2018. Will only charge one per attorney agreement. | 4,500.00 | | 6,822.58 | 68015405 |
| 02/25/2019 | Early termination penalty (one month's rental rate). | 4,500.00 | | 11,322.58 | 68015413 |
| 02/25/2019 | :Security Deposit credit | (750.00) | | 10,572.58 | 68015657 |
| 02/25/2019 | Actual Lease Rent (01/2019) Credit 16 days | (2,322.58) | | 8,250.00 | 68015658 |
| 02/25/2019 | Attorney Fee to represent this matter. (past resdient initiated attorney) | 495.00 | | 8,745.00 | 68015659 |

42. During one or more recorded telephone calls initiated by defendant FCOI, plaintiff and/or plaintiff's counsel demanded that defendant FCOI cease and desist from harassing plaintiff and his wife by unwanted phone calls, but the calls are believed to have continued for some time.

## E. Defendants' Reporting of Unlawful "Penalties" On Plaintiff's Credit Profile

43. Defendants knew that plaintiff did not agree with their demand for payment of

"penalties" as "debts" and would not pay and would not recognize the debt as valid.

44. Knowing the "penalties" were void, unenforceable, and factually baseless, defendants and each of them knew that the alleged "debts" not actually owed by plaintiff. Despite these facts, defendants reported an adverse credit notation against plaintiff's credit profile maintained with the three credit reporting agencies, and reported to one or more of the agencies, a derogatory notation that plaintiff had unpaid "debts" stemming from the "penalties."

45. In March 2020, plaintiff sought a mortgage for his residential property and learned that, due to the derogatory notation placed by one or more of the defendants, plaintiff was denied a favorable rate of mortgage and denied the ability to obtain any mortgage on the open market.

46. Despite plaintiff's objections, and plaintiff's request to have the credit reporting agencies remove the derogatory notations, defendants refused to remove the derogatory credit notations and insisted that the "debt" notations were actually valid.

47. Defendants and each of them caused damage to plaintiff with knowledge, intent, willfulness, and deliberation so as to damage plaintiff's credit standing and coerce plaintiff to pay unenforceable "penalties" in bad faith, as stated in the De Marco letters.

**Count One: Fair Debt Collection Practice Act Violation**

48. The preceding paragraphs are incorporated by reference.

49. By its actions, defendant FCOI committed one or more violations of the Fair Debt Collection Practices Act, 15 U.S.C.§§ 1692 (FDCPA). The FDCPA is applied by the courts

under "the least sophisticated debtor" standard, and construed broadly to effectuate the statute's remedial purpose. See Brown v. Card Service Center, 464 F. 3d 450, 454 (3d Cir. 2006); Caprio v. Healthcare Revenue Recovery Grp., LLC, 709 F.3d 142, 148 (3d 7Cir. 2013); Lesher v. Law Offices of Mitchell N. Kay, PC, 650 F.3d 993, 997 (3d Cir. 2011), cert. denied, 565 U.S. 1185, 132 S. Ct. 1143, 181 L. Ed. 2d 1030 (2012). "To prevail on an FDCPA claim, a plaintiff must prove that (1) she is a consumer, (2) the defendant is a debt collector, (3) the defendant's challenged practice involves an attempt to collect a 'debt' as the [FDCPA] defines it, and (4) the defendant has violated a provision of the FDCPA in attempting to collect the debt." Barbato v. Greystone Alliance, LLC, 916 F.3d 260, 265 (3d Cir. 2019).

50. Under 15 U.S. Code § 1692d(5) defendant is prohibited from "Causing a telephone to ring or engaging any person in telephone conversation repeatedly or continuously with intent to annoy, abuse, or harass any person at the called number." In violation of this statute, defendant telephoned plaintiff and plaintiff's wife repeatedly and continuously with the intent to annoy, abuse, or harass plaintiff into coercion to pay the unlawful "penalties" claimed by defendants.

51. Under 15 U.S. Code § 1692e, defendant FCOI is prohibited from using false or misleading representations of the following kinds, among others:

(2) The false representation of—

(A) the character, amount, or legal status of any debt; or
(B) any services rendered or compensation which may be lawfully received by any debt collector for the collection of a debt.

* * *

> (8) Communicating or threatening to communicate to any person credit information which is known or which should be known to be false, including the failure to communicate that a disputed debt is disputed.

* * *

> (10) The use of any false representation or deceptive means to collect or attempt to collect any debt or to obtain information concerning a consumer.

52. Despite the prohibition, defendant FCOI falsely claimed that unlawful "penalties" are somehow due and owing by plaintiff to defendants.

53. Despite the prohibition, defendant FCOI falsely and incorrectly reported the sum it claimed as "undisputed" to the credit reporting agencies.

54. Despite the prohibition, defendant FCOI attempted to characterize defendants' attempt to claim unlawful "penalties" as "debt" due and owing.

55. Under 15 U.S. Code § 1692f, defendant FCOI, as a debt collector, "may not use unfair or unconscionable means to collect or attempt to collect any debt. Without limiting the general application of the foregoing, the following conduct is a violation of this section:

> (1) The collection of any amount (including any interest, fee, charge, or expense incidental to the principal obligation) unless such amount is expressly authorized by the agreement creating the debt or permitted by law.

56. Despite the prohibition, defendant FCOI has been coercing plaintiff to collect a sum of "penalties" that is not valid or enforceable with no supporting documentation as to any alleged default or debt of plaintiff, such as a judicial judgment, with the alleged "debt" having been disputed by plaintiff and being of an unliquidated nature.

57. Under 15 U.S. Code § 1692g defendant FCOI is required to validate alleged debts

especially upon a dispute by the consumer that the claimed "debts" are invalid or unliquidated or otherwise:

> (a) Notice of debt; contents Within five days after the initial communication with a consumer in connection with the collection of any debt, a debt collector shall, unless the following information is contained in the initial communication or the consumer has paid the debt, send the consumer a written notice containing—
>
> (1) the amount of the debt;
>
> (2) the name of the creditor to whom the debt is owed;
>
> (3) a statement that unless the consumer, within thirty days after receipt of the notice, disputes the validity of the debt, or any portion thereof, the debt will be assumed to be valid by the debt collector;
>
> (4) a statement that if the consumer notifies the debt collector in writing within the thirty-day period that the debt, or any portion thereof, is disputed, the debt collector will obtain verification of the debt or a copy of a judgment against the consumer and a copy of such verification or judgment will be mailed to the consumer by the debt collector; and
>
> (5) a statement that, upon the consumer's written request within the thirty-day period, the debt collector will provide the consumer with the name and address of the original creditor, if different from the current creditor.
>
> (b) Disputed debts
>
> If the consumer notifies the debt collector in writing within the thirty-day period described in subsection (a) that the debt, or any portion thereof, is disputed, or that the consumer requests the name and address of the original creditor, the debt collector shall cease collection of the debt, or any disputed portion thereof, until the debt collector obtains verification of the debt or a copy of a judgment, or the name and address of the original creditor, and a copy of such verification or judgment, or name and address of the

> original creditor, is mailed to the consumer by the debt collector. Collection activities and communications that do not otherwise violate this subchapter may continue during the 30-day period referred to in subsection (a) unless the consumer has notified the debt collector in writing that the debt, or any portion of the debt, is disputed or that the consumer requests the name and address of the original creditor. Any collection activities and communication during the 30-day period may not overshadow or be inconsistent with the disclosure of the consumer's right to dispute the debt or request the name and address of the original creditor.

58. Despite these statutory requirements, when plaintiff disputed the "debts" as invalid and improper, defendant FCOI failed to remove the debts and continued its collection of improper "penalties" and other items referred by its principal. As a collection agency defendant FCOI's communication and actions in relation to plaintiff, an alleged "debtor," violated the statutory sections pleaded above.

59. By reason of these violations, defendant FCOI caused plaintiff to suffer significant injury, including the denial of credit, loan(s) at market rates, and other benefits, for which damages are appropriate

**Count Two: Declaratory Judgment**

60. The preceding paragraphs are incorporated by reference.

61. There exists an alleged dispute that defendant TDC FORT LEE, LLC, and/or defendant LINCOLN PROPERTIES holds a valid "debt" or unenforceable "penalties" stemming from defendants' failure to mitigate injury by re-listing Unit 1025 for rent as soon as plaintiff's December 27, 2018, notice to quit tenancy was served by hand delivery, and plaintiff in fact moved out on January 15, 2019.

62. Because plaintiff did not breach but terminated the lease properly; because

defendants failed to mitigate damages; because plaintiff owed no sum of money under the lease; and because any claimed "penalties," as stated in the De Marco Law Firm's letters, were unenforceable and void, plaintiff seeks declaratory judgment that the defendants had no basis to pursue any false claim of "debt" or penalty recovery. Plaintiff thus seeks declaratory judgment as stated above.

**Count Three: State Law Defamation**

63. The preceding paragraphs are incorporated by reference.

64. Defendant TDC FORT LEE, LLC, and/or defendant LINCOLN PROPERTIES schemed individually or together to use unenforceable or non-existing "debt" allegations to coerce plaintiff to pay "penalties" which were void and unenforceable.

65. These defendants and each of them then proceeded to lodge an adverse credit notation to credit reporting bureaus that plaintiff was in default of debt of a specific sum, the sum concocted by these defendants or either of them, and intended to use such adverse credit report to coerce plaintiff to pay them.

66. The "facts" published by defendants or either of them were false and defamatory. Defendants intended the facts to result in a damaging decrease to plaintiff's credit score from close to 800 to a significantly lower sum. In March 2020, plaintiff's credit score suffered precisely the free fall defendant maliciously intended and schemed.

67. By reason of those facts, defendants TDC FORT LEE, LLC, and/or LINCOLN PROPERTIES committed libel/defamation. Defendants or either of them did so with abject malice, with the knowledge that they were using false "facts" to coerce plaintiff to pay

extortionate “penalties” that are unlawful and void. As a result of defendants' actions, plaintiff has suffered substantial injury including the denial of credit, loan(s) at market rates, and other benefits, for which damages are appropriate Because the actions of these defendants or either of them were flagrantly in bad faith, intentionally, committed, and committed with malice, punitive damages are warranted.

**Count Four: Breach of Contract and/or the Implied Covenant of Good Faith and Fair Dealing**

68. The preceding paragraphs are incorporated by reference.

69. Under New Jersey law, the parties to a contract are required to adhere to the terms of the contract and also adhere to the implied covenant of good faith and fair dealing which is judicially imputed to every contract.

70. The parties entered into a lease; the lease was originally supported by mutual covenants and other good and valuable consideration. Plaintiff began to perform, but continued performance became unfeasible due to the building’s services and environmental conditions being contrary to the defendant property management’s representations. When plaintiff thus served a notice to quit tenancy, plaintiff had valid and proper means of terminating the lease.

71. Defendant Lincoln Properties had no basis to seek “penalties,” particularly due to its abject failure to mitigate its damages by deliberately and willfully failing to place Unit 1025 on the market so as to prevent it from being re-rented by a new tenant. At this point, defendants should not have resorted to underhanded tactics of attempting to extort plaintiff

for "unpaid rent" and should have closed the account.

72. Their failure to do so renders the property management company and/or the property owner subject to this claim for breach of contract and/or breach of the covenant of good faith and fair dealing, for their abject bad faith actions. As a result of defendants' actions, plaintiff has suffered substantial injury including the denial of credit, loan(s) at market rates, and other benefits, for which damages are appropriate.

**Count Five: NJ Security Deposit Act Violation**

73. The preceding paragraphs are incorporated by reference.

74. New Jersey Security Deposit Act provides that, upon any termination of a residential tenancy, within 30 days the landlord must provide the tenant a written notice whether the security deposit is subject to any claim of setoff for damage to the premises beyond ordinary wear and tear during the tenancy. The Security Deposit Act, N.J.S.A. 46:8-19 to - 26, is "intended to protect tenants from overreaching landlords who seek to defraud tenants by diverting rent security deposits to their own use." Reilly v. Weiss, 406 N.J. Super. 71, 83, 966 A.2d 500 (App. Div. 2009).

75. Defendants TDC FORT LEE, LLC, and/or LINCOLN PROPERTIES had a duty to return plaintiff's security deposit within 30 days of January 15, 2020, or February 14, 2020, and should have tendered a return of the full security deposit, but failed and intentionally refused to do so, and may have engaged in self-help "applying" the security deposit to "other charges," which is specifically rendered unlawful by the Security Deposit Act. As a professional apartment rental operators, defendants knew or should have known

that they were bound by the Security Deposit Act but these defendants intentionally disregarded the law.

76. By reason of their actions, these defendants are liable for twice the unreturned sum of security deposit of $750.00 or $1,500.00 plus counsel fees and costs. As they had no authority to "apply" any portion of the security deposit as a purported "credit" against any disputed sum, defendants are liable for double the full sum.

WHEREFORE, plaintiff requests judgment against defendants jointly and severally:

A. Compensatory damages, including statutory damages;

B. Punitive damages;

C. Counsel fees and costs;

D. Declaratory judgment;

E. Any other relief the Court deems just and proper.

**Jury Demand**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, plaintiff requests a trial by jury.

Dated: May 19, 2020

Respectfully,

/s/ Michael Kimm

Michael S. Kimm
Jonathan Lugo
KIMM LAW FIRM
Attorneys for plaintiff